## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| Mark Drust individually and as a representative of a class of similarly situated persons, and on behalf of the Southwest Research Institute Retirement Plan,<br><br>                  Plaintiff,<br>v.<br><br>Southwest Research Institute, and John Does 1-20,<br><br>                  Defendants. | Case No. 5:23-cv-767<br><br>**COMPLAINT**<br><br>**CLASS ACTION** |

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff Mark Drust ("Plaintiff"), individually and as a representative of the Class described herein, and on behalf of Southwest Research Institute Retirement Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Southwest Research Institute ("Southwest Research") and John Does 1-20 (collectively, "Defendants"). Defendants breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan, the Plan participants, and their beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief.

## INTRODUCTION

2.      As of the fourth quarter of 2022, Americans had approximately $9.3 trillion in assets invested in defined contribution plans, such as 401(k) plans offered by for-profit companies and 403(b) plans offered by tax-exempt and non-profit organizations.[1] Since the passage of Section 401(k) of the Internal Revenue Code in 1978, only 15% of private-sector workers have access to defined-benefit plans, more commonly called pension plans. Instead, the vast majority of workers now hold their retirement savings in defined-contribution plans like 401(k) and 403(b) plans.

3.      Defined-contribution plans are far more prone to mismanagement and misconduct than defined benefit-plans. "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). Because the plan sponsor is responsible for making sure that the defined-benefit plan is sufficiently capitalized, the sponsor bears all risks related to excessive fees and investment underperformance and has every incentive to keep costs low and promptly remove imprudent investments. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015); *see also Thole*, 140 S. Ct. at 1618 (noting that in defined contribution plans, retirees' level of benefits "can turn on the plan fiduciaries' particular investment decisions"). Thus, because all risks related to high

---

[1] *See* Investment Company Institute, *Retirement Assets Total $33.7 Trillion in Third Quarter 2022* (Dec. 15, 2022), *available at* https://www.ici.org/statistical-report/ret_22_q4 (last visited June 12, 2023).

fees and poorly performing investments are borne by participants, the sponsor has no direct stake in keeping costs low or closely monitoring the plan and its service providers to ensure that every investment remains prudent and in the best interests of participants.

4.      The real-life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career.[2] Put another way, differences of less than 1% in annual returns can force employees to work extra years to recoup the money lost from the imprudent management of a retirement plan.

5.      To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These duties are "the highest known to the law." *Schweitzer v. Inv. Comm. Of Phillips 66 Sav. Plan*, 960 F.3d 190, 194 (5th Cir. 2020). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.      Contrary to these fiduciary duties, Defendants have failed to administer the Plan in the best interests of participants and failed to employ a prudent process for managing the Plan. Instead, Defendants have used a single service provider, Teachers Insurance and Annuity Association of America ("TIAA"), to serve as the Plan's recordkeeper, investment advisor, and investment manager service since at least 2009.[3] Defendants have never sought any other service

---

[2] *See* Melanie Hicken, *Your Employer May Cost You $100K in Retirement Savings*, CNN Money (Mar. 27, 2013), *available at* http://money.cnn.com/2013/03/27/retirement/401k-fees/ (last visited June 12, 2023).

[3] The DOL instituted new annual reporting rules effective January 1, 2009, requiring large ERISA plans to file audited financial statements. Thus, financial information for the Plan

providers for the Plan and have failed to scrutinize TIAA's advice and recommendations. Instead of heeding the well-documented warnings regarding TIAA's self-interested behavior, Defendants parrot TIAA's false and misleading language regarding TIAA's history and results.

7.     For example, since at least 2009, Defendants have maintained a Plan investment menu consisting *solely* of investments managed by TIAA or its affiliate the College Retirement Equities Fund ("CREF").[4] Specifically, since that time the Plan has included at least twenty TIAA investments and *zero* investments managed by other investment companies. The Plan is the only ERISA-covered plan with at least $250 million in assets, out of over 9,000 such plans, to offer exclusively TIAA investments.

8.     Throughout that time, Defendants **have never removed a single investment from the Plan**. Instead, Defendants have continued to add TIAA investments. The Plan now consists of 28 TIAA investments and zero investments managed by other companies.[5]

9.     The retention of additional TIAA investments and the failure to remove a single TIAA investment over at least the last 14 years results from a failure to appropriately monitor TIAA and its investments, not because each TIAA investment remains perpetually prudent. For example, numerous TIAA funds underperformed their own benchmarks and their peers for decades by as much as 2% *per year*, yet remain in the Plan. As explained below, when

---

predating 2009 is not publicly available. This complaint repeatedly mentions imprudent behavior occurring at least as early as 2009, although such behavior likely originated even earlier.
[4] Although the company has rebranded to "TIAA" from its long-time name "TIAA-CREF", the two have been intertwined since the 1950s and continue to be managed by the same Board of Governors. *See* https://www.tiaa.org/public/about-tiaa/corporate-governance-leadership#:~:text=We've%20changed%20from%20TIAA,part%20of%20what%20we%20do. Thus, investments managed by CREF are TIAA's proprietary investments.
[5] The Plan retains two different suites of TIAA target-date-funds, designed for participants to choose the vintage that corresponds with their anticipated retirement date. For purposes of this calculation, each suite of target-date-funds is counted as one investment.

compounded over time, an underperformance of this magnitude can significantly reduce the retirement savings of Plan participants.

10.     Additionally, Defendants added numerous TIAA index funds to the Plan despite those funds being more expensive than nonproprietary index funds that track the exact same index. In other words, Defendants have allowed participants to pay increased expenses for no increased value because they blindly select TIAA for each investment without appropriately considering alternatives. Had Defendants undergone a prudent review of the available options tracking the exact same index, they would not have selected more expensive versions of these passive investments that offer no value for their increased fees.

11.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the duty of prudence (Count One) and a claim against Southwest Research for its failure to monitor fiduciaries (Count Two).

## JURISDICTION AND VENUE

12.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

13.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFF

15.     Plaintiff Drust resides in San Antonio, Texas and has participated in the Plan since approximately 1992. As a participant, Plaintiff invested in multiple investments managed by TIAA and has been financially injured by the unlawful conduct described herein. Plaintiff's account would be worth more today had Defendants not violated ERISA as described herein.

### THE PLAN

16.     The Plan is an "employee pension benefit plan[s]" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34) covering all eligible employees of Southwest Research and its subsidiaries and affiliates, including Plaintiff. The Plan is of the type commonly referred to as a "403(b) plan."[6]

17.     The Plan held between approximately $1.19 billion to $1.56 billion in assets among 5,500 and 5,900 participants with account balances throughout the relevant period.

18.     Participants in the Plan may direct the investment of their account assets from among the lineup of designated investment alternatives (i.e., investment options). Because Defendants determine the designated investment alternatives that are offered, the investment lineup is critical to participants' investment results and the retirement benefits they receive.

### DEFENDANTS

#### Southwest Research

19.     Defendant Southwest Research is a science and technology research institution headquartered in San Antonio, Texas.

---

[6] A 403(b) plan is essentially the same as a 401(k) plan except that it is utilized by non-profit companies. For purposes of the allegations in this complaint, there is no material difference between 401(k) plans and 403(b) plans.

20.     Southwest Research is the "plan sponsor" within the meaning of 29 U.S.C.
§ 1002(16)(B) and has the ultimate authority to control and manage the operation and
administration of the Plan. Southwest Research also lists itself as the Plan Administrator in the
Plan's Forms 5500. Because Southwest Research exercises discretionary authority or control
with respect to management and administration of the Plan and disposition of the Plan's assets, it
is a functional fiduciary under 29 U.S.C § 1002(21)(A).

21.     Southwest Research is also a fiduciary because it has authority to appoint and
remove fiduciaries to manage the Plan. The authority to appoint, retain, and remove plan
fiduciaries constitutes discretionary authority or control over the management or administration
of the plan, and thus confers fiduciary status under. 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. §
2509.75-8 (D-4).

22.     Plan sponsors such as Southwest Research commonly delegate their fiduciary
duties to specific individuals or a committee of individuals who are responsible for administering
the plan. To the extent Southwest Research has appointed such a committee to administer the
Plan, Southwest Research retains a continuing duty to monitor the appointed fiduciaries and
ensure that they are complying with the terms of the Plan and ERISA. 29 § 2509.75-8 (FR-17).
This monitoring duty includes the responsibility to "take required corrective action" upon
discovery of possible deficiencies. *In re Williams Co. ERISA Litig.*, No. 02-153 (N.D. Okla. Aug.
22, 2003) (DOL Amicus Brief, at 5, 8-9).

*John Does 1-20*

23.     Plaintiff is unaware of any individuals or entities that have been designated
fiduciary responsibility by Southwest Research because that information is within Defendants'
exclusive possession. To the extent Southwest Research has designated the day-to-day

management of the Plan to individuals or groups of individuals such as an investment committee

or administrative committee, these individuals or entities are functional fiduciaries pursuant to 29

U.S.C. § 1002(21)(A).

24.     Each Defendant are also subject to co-fiduciary liability under 29 U.S.C. §

1105(a)(1)-(3) because they enabled other fiduciaries to commit breaches of fiduciary duties,

failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to

remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES

25.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of

retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the
> participants and beneficiaries and—
>
> (A)     for the exclusive purpose of
>
>         (i)     providing benefits to participants and their beneficiaries; and
>
>         (ii)    defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then
>         prevailing that a prudent man acting in a like capacity and familiar with such
>         matters would use in the conduct of an enterprise of like character and with like
>         aims . . . .

26.     These duties are "the highest known to the law." *Schweitzer*, 960 F.3d at 194.

### DUTY OF PRUDENCE

27.     ERISA's "'prudent person'" standard "measure[s] fiduciaries' investment

decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419

(2014) (quotation omitted). To meet this exacting standard, a fiduciary's conduct "must bear the

marks of loyalty, skill, and diligence expected of an expert in the field." *Sweda v. Univ. of Penn.*,

923 F.3d 320, 329 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) (quotation omitted). "It is

8

not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. A pure heart and an empty head are not enough." *Id.*

28.     Prudent management of a retirement plan includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Intern.*, 575 U.S. 523, 529 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* at 530 (quotation omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu of investment options" or for failing to monitor the plan's investment options to ensure that each option remains prudent. *Pfeil v. State Street and Bank Trust Co.*, 671 F.3d 585, 599-600 (6th Cir. 2012) (abrogated on other grounds by *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014)).

29.     Every Plan investment must be prudent in its own right; maintaining a mix or range of investment options does not turn an imprudent investment into a prudent one or otherwise insulate plan fiduciaries from liability for failing to remove an imprudent investment. *See Hughes v. Northwestern University*, 142 S. Ct. 737, 742 (2022).

30.     Integral to the duty of prudence is the duty to minimize costs. "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328 (quotation omitted). Failing to closely monitor and minimize expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees), constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

31.     ERISA requires fiduciaries to monitor expenses and ensure that they are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of participants … for the exclusive purpose of[] providing benefits … and defraying reasonable expenses of administering the plan[.]"); *Sweda*, 923 F.3d 3at 328 ("Fiduciaries must … understand and monitor plan expenses."). Given the significant variation in costs attributable to plan size, the reasonableness of expenses charged to a plan should be determined by comparisons to other similarly sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character"). A fiduciary may breach its fiduciary duty by authorizing higher-than-appropriate fees. *See Tussey v. ABB, Inc.*, 746 F.3d at 336 (affirming judgment against plan sponsor based on "overpaying" recordkeeper); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (failure to solicit bids, and higher-than-market fees, supported triable fiduciary breach claim).

## DEFENDANTS' VIOLATIONS OF ERISA

### I.     DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES IN MANAGING THE PLAN

32.     As discussed below, Defendants allowed TIAA to profit from Plan participants for more than a decade without scrutinizing TIAA's investment recommendations or the fees or performance of TIAA investments in the Plan.

### A.     Defendants Failed to Scrutinize TIAA or its Proprietary Investments

33.     Since at least 2009, Defendants have retained TIAA as the Plan's sole service provider. In that role, TIAA provides recordkeeping and administrative services as well as

investment advisory services to the Plan.[7] In its role as investment advisor, TIAA provides investment advice to the Plan, although Defendants retain fiduciary responsibility for selecting and monitoring the Plan's investment menu. In other words, Defendants are responsible for properly scrutinizing TIAA and its recommendations to the Plan and ensuring that each individual investment is a prudent option for Plan participants. This duty is heightened when TIAA recommends its proprietary investments or other services for which it earns fees. *See Howard v. Shay*, 100 F.3d 1484, 1488-89 (9th Cir. 1996) (Where a potential conflict of interest exists, fiduciaries must engage in an "intensive and scrupulous independent investigation of their options to insure that they act in the best interests of plan beneficiaries.").

34.     Instead of properly scrutinizing TIAA and considering other alternatives for the Plan, Defendants have allowed the Plan to be TIAA's cash cow. Specifically, Defendants have continued to retain TIAA as the Plan's sole service provider for over a decade and have maintained an investment lineup exclusively containing TIAA investments. In stark contrast to other fiduciaries, Defendants are the ***only*** ERISA-covered plan in the country with at least $250 million in assets out of over 9,000 such plans to maintain an all-TIAA lineup.

35.     This is not without consequence for Plan participants. Investment returns within fund families are more closely correlated than investment returns among different fund companies.[8] Thus, constraining participants to an all-TIAA lineup increases the risk across the

---

[7] Although the Plan's form 5500s do not list TIAA as providing trustee and custodial services to the Plan, they do not list any other service provider as providing those services either. Because TIAA does in fact offer trustee and custodial services, and Defendants do not identify any other service providers on the Plan's forms 5500, it is likely that TIAA provides these services (and all other services) to the Plan as well.

[8] *See* Elton, Edwin J. and Green, T. Clifton and Gruber, Martin J*., The Impact of Mutual Fund Family Membership on Investor Risk*, The Journal of Financial and Quantitative Analysis, Vol. 42 No. 2 (June 2007).

Plan's portfolio.  Quantitatively, this means "for an investor to have the same [risk-adjusted performance] when adding another fund from within a family rather than from another family would require the in-family fund to have an additional 50 to 70 basis points in extra return."[9]

36.     The correlation of all of the TIAA actively managed domestic equity mutual funds in the Plan, and the ten-year correlations between those five funds, range between 0.83 to 0.96. According to Morningstar, a correlation above .70 is considered a "high" degree of correlation. In other words, TIAA investments need to significantly outperform in order to offset the increased risk that participants incur from being offered an all-TIAA lineup. However, this was not the case.

37.     Despite consistent underperformance from numerous TIAA funds, Defendants have not removed a single investment from the Plan since at least 2009. Instead, Defendants have continued to add additional TIAA investments without determining whether they serve Plan participants' best interests compared to investments managed by other companies.

38.     Defendants have unnecessarily gone all-in on TIAA despite TIAA's self-interested behavior being well-documented. TIAA was the subject of an investigation by the New York Attorney General's Office for dishonest marketing practices creating large commissions for TIAA. The investigation found that TIAA encouraged employees to falsely advertise to clients that employees received no commissions on TIAA products when their employees' compensation was heavily incentivized to push TIAA products on customers regardless of the customer's needs. In doing so, TIAA "relied on the trust of its clients" to push unnecessary products and grow its business.

39.     Further, although Congress revoked TIAA's non-profit status in 1997, TIAA

---

[9] *Id.*

continues to push its "non-profit heritage" and "culture of objectivity and acting solely in the best interests of our clients" to gain trust among clients, many of whom are non-profits and non-profit employees. In fact, TIAA is "neither objective nor disinterested" and sought every opportunity to promote itself, including holding "WHALE calls" dedicated to strategizing how to promote TIAA products to clients with large amounts of assets under management.

40.     The Plan has over $1.5 billion dollars and is one of the 900 largest plans in the country, and likely would have garnered special interest from TIAA. Defendants have a fiduciary duty to independently investigate Plan service providers and the Plan's investments to ensure they are in the best interests of participants. Based on the Plan's investment menu and continued use of TIAA products, Defendants have failed to do so.

41.     In fact, not only have Defendants failed to scrutinize TIAA, Defendants parrot TIAA's language to create a false sense of comfort among Plan participants by touting TIAA's "strong nonprofit heritage"[10] and assuring participants that "TIAA offers low fees, a long-term approach to investing and a full line of financial products and services provided by consultants who never receive commissions."[11] If participants have questions about retirement, Defendants are eager to direct them to TIAA's salespeople, who have a documented history of misleading and manipulating investors.

42.     By promoting TIAA as a trustworthy provider for participants, Defendants exhibit a lack of independent thinking that led to a dereliction of their fiduciary duties. Regardless of

---

[10] The notion that TIAA still operates like a non-profit is ludicrous. TIAA's CEO received nearly $18 million in compensation in 2021, and also has a company car and driver for personal use. https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.  This is not a new development. In 2016, the New York Times reported that TIAA's CEO makes over $5.1 million *more* than the CEO of Citigroup. https://www.nytimes.com/2017/10/21/business/the-finger-pointing-at-the-finance-firm-tiaa.html.

[11] https://www.swri.org/sites/default/files/employee-benefits-guide-inside-sa.pdf.

whether Defendants abided by TIAA's recommendations or trusted their advice, that is not enough to meet their exacting fiduciary standards. For retirement plan fiduciaries, "[t]he law expects more than good intentions. A pure heart and an empty head are not enough." *Sweda*, 923 F.3d at 329.

43.     Taken together, Defendants' blind adherence to TIAA for at least 15 years raises a plausible inference that they never investigated alternative service providers or solicited bids from providers other than TIAA.

**B.     Defendants Failed to Prudently Monitor the Plan's Investment Menu**

44.     The Plan's investment menu consists exclusively of TIAA investments, many of which have underperformed for decades. Yet, at least since 2009, if not earlier, Defendants have never removed or replaced a single investment from the Plan.

45.     For example, the TIAA-CREF Mid-Cap Value Fund has been in the Plan since at least 2009, but has underperformed its prospectus benchmark[12] over every single ten-year period since at least the ten-year period ending in 2014 (*i.e.* the years 2005-2014). Leading up to and during the putative class period, the fund has also underperformed numerous comparable funds that share similar investment strategies, objectives, and risks that were available to large plans like the Plan. That is, like the TIAA-CREF Mid-Cap Value Fund, each comparator fund identified below uses the Russell Mid Cap Value index as its prospectus benchmark, has been categorized by Morningstar as falling within the Mid Cap Value Morningstar Category, is actively managed, invests at least 85% of its assets in U.S. stocks of companies with medium market capitalizations, invests in fewer than 120 and greater than 60 of such stocks, seeks to invest in the stocks of companies that are viewed as undervalued within the marketplace, and is

---

[12] The prospectus benchmark is the benchmark chosen by TIAA that each actively managed fund is designed to exceed.

exposed to similar uncertainties such as market risk, mid-capitalization risk, active management risk, and style risk:[13]

| Fund (Ticker) | 2016 (10-Year Return)[14] | 2017 (10-Year Return) | 2018 (10-Year Return) | 2019 (10-Year Return) | 2020 (10-Year Return) | 2021 (10-Year Return) | 2022 (10-Year Return) |
|---|---|---|---|---|---|---|---|
| **TIAA-CREF Mid-Cap Value Instl (TIMVX)** | 7.15% | 7.62% | 11.66% | 10.79% | 8.21% | 11.52% | 8.63% |
| ***Russell Mid Cap Value TR USD*** | *7.59%* | *9.10%* | *13.03%* | *12.41%* | *10.49%* | *13.44%* | *10.11%* |
| **American Century Mid Cap Value R6 (AMDVX)** | 9.43% | 10.91% | 12.54% | 12.45% | 10.68% | 13.12% | 11.29% |
| **Victory Sycamore Established Value R6 (VEVRX)** | 9.83% | 10.68% | 13.36% | 12.90% | 11.62% | 14.76% | 13.19% |
| **Allspring Special Mid Cap Value R6 (WFPRX)** | 8.89% | 10.56% | 12.95% | 13.22% | 11.49% | 14.41% | 11.93% |
| **JHancock Disciplined Mid Cap Value R6 (JVMRX)** | 10.69% | 11.73% | 14.35% | 13.45% | 11.75% | 14.39% | 11.65% |

46.     This long-term underperformance versus the fund's benchmark and market

---

[13] The comparator funds in this complaint are meant to serve as examples of comparable funds commonly utilized by other retirement plans that are clearly superior to the TIAA option. This is not meant to serve as a comprehensive list of every fund that outperformed the TIAA fund over these time periods.

[14] The 10-year return represents the annual return per-year for each of the ten years in the period measured.

alternatives is the product of the TIAA-CREF fund managers' lack of skill, and not its risk

profile, as demonstrated through an analysis of the fund's alpha:[15]

| Fund (Ticker) | 2016 (10-Year Alpha) | 2017 (10-Year Alpha) | 2018 (10-Year Alpha) | 2019 (10-Year Alpha) | 2020 (10-Year Alpha) | 2021 (10-Year Alpha | 2022 (10-year Alpha) |
|---|---|---|---|---|---|---|---|
| **TIAA-CREF Mid-Cap Value Instl (TIMVX)** | -0.10 | -0.97 | -0.65 | -1.57 | -2.12 | -1.86 | -1.30 |
| **American Century Mid Cap Value R6 (AMDVX)** | 2.84 | 3.20 | 1.42 | 1.36 | 1.26 | .98 | 2.05 |
| **Victory Sycamore Established Value R6 (VEVRX)** | 2.85 | 2.46 | 1.59 | 0.96 | 1.43 | 1.68 | 3.20 |
| **Allspring Special Mid Cap Value R6 (WFPRX)** | 2.01 | 2.37 | 1.00 | 0.90 | 1.1 | 1.23 | 2.11 |
| **JHancock Disciplined Mid Cap Value R6 (JVMRX)** | 3.24 | 2.89 | 1.62 | 0.67 | 1.12 | 0.88 | 1.56 |

47.     The TIAA-CREF Mid-Cap Value Fund has exhibited significant negative alpha

over the long-term, indicating a lack of manager skill that has only worsened throughout the

putative class period. This substantial underperformance is not a blip but a clear indication that

this fund offers no value to investors and is not suitable for the Plan. Throughout the same time,

other managers with similar investment goals have exhibited significant positive alpha. Still,

Defendants have allowed the TIAA-CREF Mid-Cap Value Fund to remain in the Plan.

48.     The TIAA-CREF Mid-Cap Value Fund is not the only TIAA fund to significantly

underperform over the long-term. The TIAA-CREF Mid-Cap Growth Fund has underperformed

---

[15] Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. Positive alpha demonstrates skill, an alpha of zero demonstrates zero skill, and negative alpha shows the manager made decisions that were worse than simply tracking the benchmark. *See Alpha*, INVESTOPEDIA, https://www.investopedia.com/terms/a/alpha.asp (last visited June 12, 2023)

its prospectus benchmark over every single ten-year period since at least the ten-year period

ending in 2013. Leading up to and during the putative class period, the fund has also

underperformed numerous comparable funds that share similar investment strategies, objectives,

and risks that were available to large plans like the Plan. That is, like the TIAA-CREF Mid-Cap

Value Fund, each comparator fund identified below uses the Russell Mid Cap Growth index as

its prospectus benchmark, has been categorized by Morningstar as falling within the Mid Cap

Growth Morningstar Category, is actively managed, invests at least 85% of its assets in U.S.

stocks of companies with medium market capitalizations, invests in fewer than 120 and greater

than 60 of such stocks, and seeks to invest in the stocks of companies that are viewed as

possessing prospects for strong earnings or sales growth, and is exposed to similar uncertainties

such as market risk, mid-capitalization risk, active management risk, and style risk:

| Fund (Ticker) | 2016 (10-Year Return) | 2017 (10-Year Return) | 2018 (10-Year Return) | 2019 (10-Year Return) | 2020 (10-Year Return) | 2021 (10-Year Return) | 2022 (10-Year Return) |
|---|---|---|---|---|---|---|---|
| TIAA-CREF Mid Cap Growth Inst (TRPWX) | 7.11% | 7.89% | 13.83% | 12.73% | 14.13% | 15.08% | 8.74% |
| *Russell Mid Cap Growth TR USD* | *7.83%* | *9.10%* | *15.12%* | *14.24%* | *15.04%* | *16.63%* | *11.41%* |
| BlackRock Mid-Cap Growth Equity K (BMGKX) | 7.55% | 8.83% | 16.11% | 15.04% | 17.79% | 19.76% | 13.11% |
| T. Rowe Price Inst. Mid-Cap Equity Gr (PMEGX) | 10.43% | 11.16% | 16.84% | 15.70% | 15.21% | 17.03% | 12.46% |
| Delaware Ivy Mid Cap Growth R6 (IGRFX) | 7.84% | 9.16% | 14.57% | 13.80% | 15.39% | 17.28% | 11.71% |
| JP Morgan Mid Cap Growth R6 (JMGMX) | 7.83% | 8.94% | 14.81% | 14.54% | 16.49% | 18.41% | 13.04% |

49.    The fund's significantly poor and worsening alpha indicates that these results

stem from a significant lack of manager skill and not happenstance.

| Fund (Ticker) | 2016 (10-Year Alpha) | 2017 (10-Year Alpha) | 2018 (10-Year Alpha) | 2019 (10-Year Alpha) | 2020 (10-Year Alpha) | 2021 (10-Year Alpha | 2022 (10-year Alpha) |
|---|---|---|---|---|---|---|---|
| **TIAA-CREF Mid Cap Growth Inst (TRPWX)** | -0.68 | -1.15 | -1.44 | -1.89 | -1.53 | -2.05 | -2.81 |
| **BlackRock Mid-Cap Growth Equity K (BMGKX)** | -0.41 | -0.55 | 0.38 | 0.28 | 2.53 | 2.77 | 1.41 |
| **T. Rowe Price Inst. Mid-Cap Equity Gr (PMEGX)** | 2.58 | 2.13 | 2.06 | 1.87 | 0.64 | 1.21 | 1.68 |
| **Delaware Ivy Mid Cap Growth R6 (IGRFX)** | 0.58 | 0.77 | -0.41 | -0.29 | 0.02 | 0.41 | 0.10 |
| **JP Morgan Mid Cap Growth R6 (JMGMX)** | -0.15 | -0.39 | -1.07 | -0.75 | 0.61 | 1.19 | 1.49 |

50.     The TIAA-CREF Mid-Cap Growth Fund has had a negative alpha over every ten-year period since at least the period ending in 2013. In contrast to other managers, the TIAA fund's significant and consistent negative alpha over long periods is all the more jarring and a clear indication that this fund offered no value to Plan participants.  A prudent fiduciary would have recognized this and removed or replaced the fund with an option that was not managed by TIAA.

51.     The TIAA-CREF Large-Cap Value Fund is a similar story. Leading up to and during the putative class period, the fund has underperformed its prospectus benchmark as well as numerous comparable funds that share similar investment strategies, objectives, and risks that were available to large plans like the Plan. That is, like the TIAA-CREF Large-Cap Value Fund, each comparator fund identified below uses the Russell 1000 Value index as its prospectus

benchmark, has been categorized by Morningstar as falling within the Large Cap Value

Morningstar Category, is actively managed, invests at least 85% of its assets in U.S. stocks of

companies with large market capitalizations, invests in fewer than 100 and greater than 70 of

such stocks, and seeks to invest in the stocks of companies that are viewed as undervalued within

the marketplace, and is exposed to similar uncertainties such as market risk, large capitalization

risk, active management risk, and style risk:

| Fund (Ticker) | 2016 (10-Year Return) | 2017 (10-Year Return) | 2018 (10-Year Return) | 2019 (10-Year Return) | 2020 (10-Year Return) | 2021 (10-Year Return) | 2022 (10-Year Return) |
|---|---|---|---|---|---|---|---|
| **TIAA-CREF Large Cap Value Instl (TRLIX)** | 5.70% | 6.96% | 10.84% | 10.67% | 9.22% | 12.52% | 9.71% |
| ***Russell 1000 Value TR USD*** | *5.72%* | *7.10%* | *11.18%* | *11.80%* | *10.50%* | *12.97%* | *10.29%* |
| **Hartford Equity Income R6 (HQIVX)** | 7.66% | 8.69% | 11.53% | 12.20% | 11.16% | 12.91% | 11.39% |
| **T. Rowe Price Value I (TRPIX)** | 6.75% | 8.56% | 13.09% | 12.17% | 11.64% | 14.85% | 11.48% |
| **JP Morgan Equity Income R6 (OIEJX)** | 7.56% | 9.17% | 12.59% | 13.43% | 11.91% | 13.64% | 12.01% |
| **MFS Value R6 (MEIKX)** | 6.91% | 7.85% | 11.07% | 11.91% | 11.13% | 13.69% | 11.29% |

52.    Like the TIAA-CREF Mid-Cap Value Fund, this long-term underperformance

trend began in the ten-year period ending in 2014, three years before the putative class period

began.

53.    An analysis of the fund's alpha again shows that these results were the product of

a lack of manager skill and not the result of bad luck.

| Fund (Ticker) | 2016 (10-Year Alpha) | 2017 (10-Year Alpha) | 2018 (10-Year Alpha) | 2019 (10-Year Alpha) | 2020 (10-Year Alpha) | 2021 (10-Year Alpha | 2022 (10-year Alpha) |
|---|---|---|---|---|---|---|---|
| TIAA-CREF Large Cap Value Instl (TRLIX) | -0.22 | -0.45 | -0.96 | -1.84 | -1.65 | -0.98 | -0.92 |
| Hartford Equity Income R6 (HQIVX) | 2.49 | 2.42 | 1.51 | 1.60 | 1.84 | 1.28 | 2.00 |
| T. Rowe Price Value I (TRPIX) | 0.86 | 1.15 | 1.60 | 0.33 | 1.35 | 2.16 | 1.60 |
| JP Morgan Equity Income R6 (OIEJX) | 2.48 | 2.99 | 3.04 | 2.83 | 2.31 | 1.63 | 2.34 |
| MFS Value R6 (MEIKX) | 1.43 | 1.12 | 0.51 | 0.38 | 1.01 | 1.21 | 1.36 |

54. The TIAA-CREF Large-Cap Value Fund has exhibited negative alpha over the long-term for every ten-year period beginning in the ten-year period ending in 2014.

55. The underperformance of the TIAA-CREF funds in the Plan has had a material impact on participants' retirement savings. For an employee with 35 years until retirement, a one percent difference in returns would reduce their account balance at retirement by *28 percent*.[16] The magnitude of underperformance involved here, which in many instances exceeds 1%, can lead to a similar diminution of retirement savings in even less time. For example, a participant with an initial $100,000 investment in the TIAA-CREF Mid-Cap Value fund at year-end 2012 would have seen that amount grow to $228,785 over the ten-year period ending 2022. This same $100,000 investment would have grown to $345,292 had it instead been invested in the Victory Sycamore Established Value R6 fund, a fund that outperformed its TIAA-CREF counterpart over every ten-year period from 2016 through 2022. The difference in returns between the two funds of $116,507 represents a reduction in retirement savings of roughly one-third for an investor in

---

[16] *See A Look at 401(k) Plan Fees*, DEP'T OF LABOR, Sept. 2019, at 2, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited June 16, 2023).

the TIAA fund.

56.     The real dollar impact of the TIAA-CREF funds' underperformance is illustrated

below. Each cell calculates the value of the TIAA-CREF mutual fund after ten years, assuming a

$100,000 initial investment at the beginning of the ten-year period, and compares the value of

that investment to that of various prudent alternatives that were available to the Plan:

*TIAA-CREF Mid-Cap Value*

| Fund (Ticker) | 2016 (10-Year Growth of $100,000) | 2017 (10-Year Growth of $100,000) | 2018 (10-Year Growth of $100,000) | 2019 (10-Year Growth of $100,000) | 2020 (10-Year Growth of $100,000) | 2021 (10-Year Growth of $100,000) | 2022 (10-Year Growth of $100,000) |
|---|---|---|---|---|---|---|---|
| **TIAA-CREF Mid-Cap Value Instl (TIMVX)** | $199,403 | $208,460 | $301,222 | $278,562 | $220,204 | $297,525 | $228,785 |
| **American Century Mid Cap Value R6 (AMDVX)** | $246,169 | $281,659 | $325,792 | $323,337 | $275,748 | $343,178 | $291,398 |
| **Victory Sycamore Established Value R6 (VEVRX)** | $255,318 | $275,813 | $350,450 | $336,371 | $300,227 | $396,256 | $345,292 |
| **Allspring Special Mid Cap Value R6 (WFPRX)** | $234,296 | $272,849 | $337,968 | $346,272 | $296,597 | $384,148 | $308,513 |
| **JHancock Disciplined Mid Cap Value R6 (JVMRX)** | $276,077 | $303,061 | $382,285 | $353,235 | $303,838 | $383,572 | $301,136 |

*TIAA-CREF Mid-Cap Growth*

| Fund (Ticker) | 2016 (10-Year Growth of $100,000) | 2017 (10-Year Growth of $100,000) | 2018 (10-Year Growth of $100,000) | 2019 (10-Year Growth of $100,000) | 2020 (10-Year Growth of $100,000) | 2021 (10-Year Growth of $100,000) | 2022 (10-Year Growth of $100,000) |
|---|---|---|---|---|---|---|---|
| **TIAA-CREF Mid Cap Growth Inst (TRPWX)** | $198,768 | $213,774 | $365,205 | $331,565 | $374,984 | $407,339 | $231,086 |
| **BlackRock Mid-Cap Growth Equity K (BMGKX)** | $207,133 | $233,016 | $445,336 | $405,835 | $513,935 | $606,676 | $342,878 |
| **T. Rowe Price Inst. Mid-Cap Equity Gr (PMEGX)** | $269,720 | $288,073 | $474,054 | $429,831 | $411,977 | $482,082 | $323,475 |
| **Delaware Ivy Mid Cap Growth R6 (IGRFX)** | $212,716 | $240,336 | $389,552 | $364,226 | $418,365 | $492,101 | $302,596 |
| **JP Morgan Mid Cap Growth R6 (JMGMX)** | $212,468 | $235,363 | $397,765 | $388,673 | $459,963 | $541,898 | $340,651 |

*TIAA-CREF Large Cap Value*

| Fund (Ticker) | 2016 (10-Year Growth of $100,000) | 2017 (10-Year Growth of $100,000) | 2018 (10-Year Growth of $100,000) | 2019 (10-Year Growth of $100,000) | 2020 (10-Year Growth of $100,000) | 2021 (10-Year Growth of $100,000) | 2022 (10-Year Growth of $100,000) |
|---|---|---|---|---|---|---|---|
| **TIAA-CREF Large Cap Value Instl (TRLIX)** | $174,092 | $196,012 | $279,952 | $275,529 | $241,524 | $325,206 | $252,730 |
| **Hartford Equity Income R6 (HQIVX)** | $209,190 | $230,190 | $297,796 | $316,253 | $288,078 | $336,653 | $294,137 |
| **T. Rowe Price Value I (TRPIX)** | $192,191 | $227,298 | $342,156 | $315,282 | $300,832 | $399,255 | $296,571 |
| **JP Morgan Equity Income R6 (OIEJX)** | $207,263 | $240,400 | $327,345 | $352,687 | $308,074 | $359,176 | $310,785 |
| **MFS Value R6 (MEIKX)** | $194,976 | $212,958 | $285,705 | $307,977 | $287,235 | $360,820 | $291,566 |

57.     A prudent fiduciary would have monitored and removed these funds in favor of investments not managed by TIAA. Yet, Defendants have not only retained every single TIAA fund, they have doubled-down on TIAA by adding additional TIAA investments despite these poor results. Combined with the fact that Defendants have never removed a single investment from the Plan, this plausibly suggests that Defendants have failed to appropriately monitor the Plan's investments and service providers in breach of their duty of prudence.

**C.     Defendants Selected High-Cost TIAA Index Funds That Provided No Value for their Excess Fees**

58.     Throughout the relevant period, Defendants selected and retained TIAA's proprietary index funds for the Plan's investment menu. Each of these index funds tracks one or more benchmark indices to provide exposure to certain asset classes or segments of the market. TIAA index funds are the only index funds offered to Plan participants.

59.     An index fund is a passively managed, pooled-investment product designed to

mirror the performance of a particular benchmark index, not deliver excess returns compared to the index.[17] For example, S&P 500 index funds aim to track the Standard & Poor's 500 Index, a market capitalization-weighted index of the 500 largest publicly traded companies in the United States.

60.     The marketplace for index funds has evolved such that for any given asset class, there are generally dozens of different products available that track a benchmark index which tracks that particular asset class. Regardless of the benchmark index that an investor wishes to track, there will generally be several products in the marketplace from which to choose.

61.     The marketplace for index funds is highly competitive, with several companies offering index fund products that track benchmark indices with a high degree of precision, while charging very low fees. These companies—which include BlackRock, Vanguard, and Fidelity— have captured a very large percentage of market share of passively managed assets among large retirement plans such as the Plan.

62.     In contrast, less competitive firms sometimes charge fees that are significantly higher than the fees charged by leading companies for managing an index fund that tracks the exact same index. A higher level of fees does not in any way correspond to a higher quality product or higher level of services. To the contrary, the least expensive offerings often have the lowest level of tracking error, meaning that they track the index with the highest level of precision.[18]

---

[17] *See Investor Bulletin: Index Funds*, United States Securities and Exchange Commission (Aug. 6, 2016), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-26?utm_source=google&utm_campaign=2021_nonbrand_campaign&utm_medium=search.

[18] *See* Ari I. Weinberg, *Watch an Index Fund's 'Tracking Error'*, Wall Street Journal (July 9, 2012),        https://www.wsj.com/articles/SB10001424052702303734204577466453629079534

63.     Plaintiff does not challenge the decision to use passive investments generally. Defendants' fiduciary breaches relate to *which* index funds they used to track each of these indices, a determination that fell squarely within the scope of their fiduciary duties.

64.     A large investor such as the Plan can easily retain a low-cost, high-quality index fund that successfully tracks the relevant index. Yet, Defendants retained TIAA index funds that cost ***double or triple*** other low-cost index funds tracking the same index that were available to the Plan.

| Fund (Ticker) | 2017 Net Expense Ratio | 2018 Net Expense Ratio | 2019 Net Expense Ratio | 2020 Net Expense Ratio | 2021 Net Expense Ratio | 2022 Net Expense Ratio |
|---|---|---|---|---|---|---|
| **TIAA-CREF Bond Index Inst (TBIIX)** | 0.12% | 0.12% | 0.11% | 0.11% | 0.11% | 0.09% |
| **Vanguard Total Bond Market Index (VBTIX)** | 0.04% | 0.035% | 0.035% | 0.035% | 0.035% | 0.035% |
| **Fidelity US Bond Index (FXNAX)** | 0.03% | 0.03% | 0.03% | 0.03% | 0.02% | 0.02% |
| **iShares US Aggregate Bond Index K (WFBIX)[19]** | 0.04% | 0.04% | 0.04% | 0.04% | 0.04% | 0.05% |

| Fund (Ticker) | 2017 Net Expense Ratio | 2018 Net Expense Ratio | 2019 Net Expense Ratio | 2020 Net Expense Ratio | 2021 Net Expense Ratio | 2022 Net Expense Ratio |
|---|---|---|---|---|---|---|
| **TIAA-CREF Emerging Markets Equity Index Inst (TEQLX)** | 0.21% | 0.20% | 0.20% | 0.20% | 0.18% | 0.19% |
| **Fidelity Emerging Markets Index (FPADX)** | 0.09% | 0.06% | 0.08% | 0.08% | 0.07% | 0.07% |

(finding that "[f]or many index funds . . . tracking error essentially will be equivalent to the fund's expense ratio.").

[19] BlackRock operates its index mutual funds under the iShares brand name.

| Fund (Ticker) | 2017 Net Expense Ratio | 2018 Net Expense Ratio | 2019 Net Expense Ratio | 2020 Net Expense Ratio | 2021 Net Expense Ratio | 2022 Net Expense Ratio |
|---|---|---|---|---|---|---|
| CREF Equity Index R3 (QCEQIX) | 0.23% | 0.21% | 0.21% | 0.21% | 0.16% | 0.17% |
| iShares Total US Stock Market Idx K (BKTSX) | 0.03% | 0.03% | 0.03% | 0.03% | 0.03% | 0.03% |
| Vanguard Russell 3000 Index I (VRTTX) | 0.08% | 0.08% | 0.08% | 0.08% | 0.08% | 0.08% |

| Fund (Ticker) | 2017 Net Expense Ratio | 2018 Net Expense Ratio | 2019 Net Expense Ratio | 2020 Net Expense Ratio | 2021 Net Expense Ratio | 2022 Net Expense Ratio |
|---|---|---|---|---|---|---|
| TIAA-CREF S&P 500 Index Inst (TISPX) | 0.06% | 0.05% | 0.05% | 0.05% | 0.05% | 0.05% |
| Vanguard Institutional Index I (VINIX) | 0.04% | 0.035% | 0.035% | 0.035% | 0.035% | 0.035% |
| Fidelity 500 Index (FXAIX) | 0.02% | 0.02% | 0.02% | 0.02% | 0.02% | 0.02% |
| iShares S&P 500 Index K (WFSPX) | 0.04% | 0.04% | 0.03% | 0.03% | 0.03% | 0.03% |

65.     It is clear that Defendants did not conduct any review of index funds available from other investment managers. If they had done so, they would not have allowed Plan participants to pay fees *up to seven times higher* than marketplace alternatives that tracked the exact same index. Indeed, since at least 2017, even TIAA has used BlackRock index funds in its own employee retirement plan rather than the more expensive TIAA index funds. Here, Defendants retained TIAA index funds without a second thought just as they did in every other investment category.

## II.    PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES

66.    Plaintiff did not have knowledge of all material facts (including, among other things, the actions of similarly situated fiduciaries, the availability of less expensive investment alternatives, TIAA's role with the Plan and its self-interested behavior, and investment performance versus other available alternatives in similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before the suit was filed. Further, Plaintiff does not have actual knowledge of the details of Defendants' decision-making processes with respect to the Plan (including Defendants' specific processes for monitoring and evaluating the Plan's investments) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

67.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

68.    Plaintiff asserts claims in Counts I-II on behalf of a class of participants and beneficiaries of the Plan (the "Class") defined as follows:[20]

> All participants and beneficiaries of the Southwest Research Institute Retirement Plan at any time on or after June 16, 2017, excluding any persons with responsibility for the Plan's investment or administrative functions.

---

[20] Plaintiff reserves the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

69.     <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 5,500 and 5,900 participants at all relevant times during the applicable period.

70.     <u>Typicality</u>: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff's assets were invested in the Plan and suffered financial harm as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members with regard to the Plan. Defendants' investment decisions were in breach of their fiduciary duties and affected all of the Plan's participants similarly.

71.     <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and Plaintiff has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

72.     <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

        a.   Whether Defendants are fiduciaries with respect to the Plan;

        b.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

        c.   The proper form of equitable and injunctive relief; and

        d.   The proper measure of monetary relief.

73.     Courts have repeatedly held that "ERISA litigation of this nature presents a paradigmatic example of a [Rule 23](b)(1) class." *In re Enron Corp.*, 2006 WL 1662596, at *14

(S.D. Tex. June 7, 2006) (collecting cases).

74.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

75.     Class certification is also appropriate under Fed R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. § 1109 and 1132 would be similarly dispositive of the interests of other participants.

76.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting individual class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely

29

difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of the Duty of Prudence
### 29 U.S.C. § 1104(a)(1)(A)-(B)

77.    As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

78.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in connection with the administration of the Plan and selection and monitoring of the Plan's investments and service providers.

79.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of participants and beneficiaries, and acting with appropriate care, skill, diligence, and prudence. Further, Defendants are directly responsible for selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. This includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

80.    As described throughout the Complaint, Defendants failed to prudently and objectively monitor the Plan's investments to ensure that each of the Plan's investments were and remained appropriate for the Plan. Defendants uniquely maintained and failed to monitor an investment lineup consisting exclusively of TIAA investments when superior alternatives preferred by prudent fiduciaries were readily available. Defendants also retained TIAA as the Plan's lone service provider for over a decade without ever questioning why TIAA continued to promote only its own products.

30

81.     Based on the conduct described above and throughout this Complaint, it is evident that Defendants did not appropriately select and monitor TIAA or the Plan's investments. Instead, Defendants' conduct shows a lack of independent judgment and complete dereliction of their duty to monitor. Further, each of the actions and omissions described in paragraph 80 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C § 1104(a)(1)(B).

82.     As a consequence of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in losses. Defendants are liable, under § 1109 and 1132, to make good to the Plan all such losses resulting from the aforementioned fiduciary breaches.

83.     Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and time effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
## Failure to Monitor Fiduciaries

84.     To the extent Southwest Research delegated its fiduciary duties to a committee or individuals, those delegates are fiduciaries of the Plan with responsibilities relating to the Plan's investment options.

85.     Southwest Research is responsible for appointing and removing those fiduciaries

and therefore has a fiduciary responsibility to monitor the performance of its appointees.

86.     A monitoring fiduciary must ensure that its appointed fiduciaries are performing

their fiduciary obligations, including those with respect to the investment and monitoring of the

Plan's assets, and must take prompt and effective action to protect the Plan and participants when

they fail to perform their fiduciary obligations in accordance with ERISA.

87.     Southwest Research breached its fiduciary monitoring duties by, among other

things:

> a.  Failing to monitor and evaluate the performance of its appointees or have a
> system in place for doing so, standing idly by as the Plan suffered significant
> losses as a result of imprudent actions and omissions;
>
> b.  Failing to monitor the processes by which the Plan's investments were
> monitored and retained, which would have alerted a prudent fiduciary to the
> breaches of fiduciary duties outlined above; and
>
> c.  Failing to remove appointees whose performance was inadequate in that they
> retained imprudent, excessively costly, and poorly performing investments
> within the Plan, all to the detriment of the Plan and participants' retirement
> savings.

88.     As a consequence of the foregoing breaches of the duty to monitor, the Plan

suffered millions of dollars per year in losses due to excessive fees and investment performance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, as a representative of the Class described herein,

and on behalf of the Plan, prays for relief as follows:

> A.  A determination that this action may proceed as a class action under Rule
> 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil
> Procedure;
>
> B.  Designation of Plaintiff as Class Representative and designation of Plaintiff's
> counsel as Class Counsel;
>
> C.  A declaration that Defendants breached their fiduciary duties under ERISA;

D.      An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.      An order enjoining Defendants from any further violations of ERISA;

F.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

G.      An award of pre-judgment interest;

H.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I.      An award of such other and further relief as the Court deems equitable and just.


Dated: June 16, 2023                          **NICHOLS KASTER, PLLP**

                                              By: */s/ Paul J. Lukas*
                                              Paul J. Lukas, MN Bar No. 022084X*
                                              Brock J. Specht, MN Bar No. 0388343**
                                              Ben Bauer, MN Bar No. 0398853**
                                              *admitted in the United States District Court for the Western District of Texas*
                                              ** *application for admission pro hac vice forthcoming*
                                              4700 IDS Center
                                              80 S 8th Street
                                              Minneapolis, MN 55402
                                              Telephone: 612-256-3200
                                              Facsimile: 612-338-4878
                                              plukas@nka.com
                                              bspecht@nka.com
                                              bbauer@nka.com


                                              Counsel for Plaintiff and the proposed Class